UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOFFREY LAGADIA,

    Petitioner,

    v.

BEN CURRY, warden,

    Respondent.

No. C 06-6561 SI (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Joffrey Lagadia, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Joffrey Lagadia was convicted in Los Angeles County Superior Court of second degree murder and was sentenced in 1991 to 15 years to life in prison. His habeas petition does not challenge his conviction but instead challenges a March 24, 2005 decision of the Board of Prison Terms, now known as and referred to herein as the Board of Parole Hearings ("BPH"), that found him not suitable for parole. The 2005 hearing was Lagadia's second subsequent parole hearing, and was conducted at a time when he was about 14 years into his 15-to-life sentence.

The BPH identified the circumstances of the commitment offense, Lagadia's escalating criminality and gang membership before incarceration, insufficient programming in prison, and disciplinary history as the reasons for the determination that Lagadia was not suitable for parole

and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Resp. Exh. B (reporter's transcript of March 24, 2005 BPH hearing (hereinafter "RT")) at 42-44. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Lagadia sought relief in the California courts. He filed a habeas petition in the Los Angeles County Superior Court that was denied in a reasoned decision. Resp. Exh. D. The California Court of Appeal also denied a habeas petition filed by Lagadia. Resp. Exh. E. The California Supreme Court summarily denied his petition for review. Resp. Exh. F.

Lagadia then filed his federal petition for a writ of habeas corpus. The petition was filed in the U. S. District Court for the Central District of California and later was transferred to this district. The court found cognizable a claim that there was not sufficient evidence to support the decision and ordered respondent to show cause why the writ should not issue. After an unsuccessful motion to dismiss, respondent filed an answer and Lagadia filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a petitioner housed at a prison in Soledad in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

2

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A. Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir. 2008); Sass, 461 F.3d at 1127-28; Cal. Penal Code § 3041(b); see also Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill,

3

472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).[1] The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decision-maker in the parole context. In addition to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision. See Greenholtz, 442 U.S. at 13. "No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of decisionmakers in predicting future behavior. Our system of federalism encourages this state experimentation." Id.; see also id. at 8.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. See Hayward, 512 F.3d at 542. One must look to state law to answer the question, "'some evidence' of what?"

B.   State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murders, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree

---

[1] Although Sass saw the requirement that the decision not be "otherwise arbitrary" as part of the "some evidence" standard, 461 F.3d at 1129, Hayward saw the "some evidence" requirement as separate from the requirement that the decision not be "otherwise arbitrary." Hayward quoted Irons, infra, for the proposition: "We have held that 'the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary."'" Hayward, 512 F.3d at 542.

4

1 murder conviction yields a minimum term of 25 years to life and a second degree murder
2 conviction yields a minimum term of 15 years to life imprisonment. See In re Dannenberg, 34
3 Cal. 4th 1061, 1078 (Cal.), cert. denied, 546 U.S. 844 (2005); Cal. Penal Code § 190. The
4 upshot of California's parole scheme described below is that a release date normally must be set
5 unless various factors exist, but the "unless" qualifier is substantial.

6     A BPH panel meets with an inmate one year before the prisoner's minimum eligible
7 release date "and shall normally set a parole release date. . . . The release date shall be set in a
8 manner that will provide uniform terms for offenses of similar gravity and magnitude in respect
9 to their threat to the public, and that will comply with the sentencing rules that the Judicial
10 Council may issue and any sentencing information relevant to the setting of parole release
11 dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall
12 set a release date unless it determines that the gravity of the current convicted offense or
13 offenses, or the timing and gravity of current or past convicted offense or offenses, is such that
14 consideration of the public safety requires a more lengthy period of incarceration for this
15 individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code
16 § 3041(b).

17     One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole
18 date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A
19 parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A
20 parole date set under this article shall be set in a manner that provides uniform terms for offenses
21 of similar gravity and magnitude with respect to the threat to the public."[2] The regulation also

---

[2] The listed circumstances tending to show <u>unsuitability</u> for parole are: the nature of the commitment offense (i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner"), the prisoner has a previous record of violence, the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense, and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are: the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

5

provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The federal habeas court's task is not to determine whether some evidence supports the reasons cited for the denial of parole, "but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers the public safety." Hayward, 512 F.3d at 543 (citation omitted).

A critical issue in parole denial cases concerns the parole authority's use of evidence about the murder that led to the conviction. Four Ninth Circuit cases provide guidance for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, Irons v. Carey, 505 F.3d 846 (2007), and, most recently, Hayward, 512 F.3d 536. Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper speculation and beyond the scope of the dispute before the court. Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in

6

determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). The next decision, Irons, aligned with Biggs, determining that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence, but emphasized that in all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853. Most recently, Hayward granted relief to a prisoner who had been in custody 27 years on his 15-to-life sentence. Hayward repeated the quoted passage from Biggs and stated Irons had noted that "'in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.' Irons, 505 F.3d at 854. 'The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.' [In re] Scott, 133 Cal.App.4th [573, 595 (Cal. Ct. App. 2005)]." Hayward, 512 F.3d at 545.[3]

    The message of these cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as

---

[3] The California Supreme Court has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense"). Hayward does not explain how Dannenberg's more-than-the-minimum-elements rule fits into the picture, and simply ignores it.

7

1 the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u>, <u>Irons</u>, and <u>Hayward</u>).
2 Also, the focus must be on whether the commitment offense demonstrates present dangerousness
3 if it is relied upon to deny parole (<u>Hayward</u>). <u>Superintendent v. Hill</u>'s standard might be quite
4 low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the
5 crime might eventually make for an arbitrary decision.

7 C.     <u>Some Evidence Supports The BPH's Decision</u>

8         The BPH identified the circumstances of Lagadia's commitment offense, escalating
9 criminality and gang membership before incarceration, insufficient programming and
10 disciplinary history as the reasons for the determination that Lagadia was not suitable for parole
11 and would pose an unreasonable risk of danger to society or a threat to public safety if released
12 from prison.

13         The crime was summarized in the board report and was described at the 2005 hearing:

> On 11/4/89, Patricia Morales and her fiancé, Miguel Sanchez, went to visit some friends and family at about 8:30 p.m. After the visit they left their friend at about 12:15 a.m. and drove down Artesia Boulevard towards Cerritos. As they drove in the victim's Cadillac, they had a disagreement and Patricia left the car at Shoemaker Street and Artesia Boulevard. She walked eastbound and the victim pulled in front of her, stopped the car, and asked her to get inside his car. Patricia refused to get into the car. [He drove] around the corner from Carmencita Street . . . to Artesia Street. Three cars attracted Patricia's attention. Inside the vehicles were passengers yelling gang slogans at Patricia and the victim. They said Barrio Santanas. Patricia described the vehicles as a small silver truck followed by a Suzuki Samurai and a small car. They traveled close to one another, past [sic] by them, and made a u-turn and came back toward them. The victim drove away from her. As the victim drove away Patricia saw the truck driven by Lagadia cut off the victim forcing the victim to crash into a pole on Vicki Street. . . . After a verbal altercation with the victim, the victim was attacked by the prisoner with a baseball bat. The victim was severely beaten causing injuries, which resulted in his death.

22 RT 8-9. The cause of death was major trauma to the head. RT 9.

23         Lagadia declined to discuss the crime, but apparently had repeatedly taken the position
24 that it was his passenger, Ray Gutierrez, who used the baseball bat on the victim. RT 10-11.

25         The BPH next considered Lagadia's pre-incarceration factors. Lagadia had a criminal
26 history that consisted of one juvenile offense and two adult offenses, all involving violence. As
27 a juvenile he had been charged with possession of a weapon (i.e., a pipe) with intent to commit
28 assault and assault with a deadly weapon; the petition had been sustained and he was put on

8

probation for three years. RT 11-12. This was gang-related activity. RT 12. As an adult, he had been charged with false imprisonment and battery; pursuant to a plea bargain, he pled guilty to battery and was sentenced to time served (of 120 days). RT 12. He also had been arrested for unlawful fighting but was arrested for the murder before that was adjudicated. See Resp. Exh. C, p. 5. There also was evidence in the record that Lagadia was believed to be an active gang member. The probation officer reported that the investigating officers and homicide detective stated that Lagadia had participated in numerous acts of street violence (such as drive-by shootings) and was known as a criminally sophisticated instigator of violence. Resp. Exh. C., pp. 10-11. Lagadia had been in a gang since he was 18. RT 34-35. Before he was incarcerated, he had consumed alcohol on weekends and used marijuana and cocaine for a few months. RT 15.

Lagadia had parole plans. He had an offer to live with his mother in Lakewood, California. He also had an offer to work at his parents' company or another company assisting Filipinos to obtain work internationally. RT 16-17. He had letters of support from other family members. He planned to participate in A.A. on parole. RT 19.

The BPH considered Lagadia's in-prison performance. The counselor's reports stated that Lagadia had received satisfactory ratings for his work in the vocational print shop and dining hall. RT 20-22. At the time of the hearing, he was a "recreation worker." RT 21. He had received vocational certificates in machine shop, vocational graphic arts, and print shop. He had his high school diploma before he entered prison; while in prison, he had taken some community college courses. He also finished two accounting seminars. He was in A.A. and had been in A.A. or N.A. since 1994. He had finished the Impact program, and was taking a "how to become a better father and not get angry" seminar. RT 21. A commissioner noted that Lagadia seemed rather "weak" in the area of programming for self-improvement. RT 24, 27.

Lagadia had received some disciplinary write-ups. RT 27. He had received two CDC-115 rule violation reports – one in 1992 for possession of inmate-manufactured alcohol and one in 1995 for being out of bounds. He also had received a CDC-128 counseling memorandum in 1994 for a less serious occurrence of being out of bounds.

1  The current psychological report was favorable. The psychologist opined that, if released
2 to the community, the risk Lagadia presented was "average for the non-offender population."
3 RT 31. The psychologist also noted that gang activity would be a precursor to violence,
4 although Lagadia demonstrated no current affiliation with a gang. One of the commissioners
5 questioned the psychological evaluation from 2005 because it was inconsistent with a 1999
6 evaluation, where the evaluator had noted a return to alcohol or gang affiliation as risk factors.
7 See RT 32-33, 37. More importantly, the commissioner noted that the psychological reports all
8 seemed to dwell on who was swinging the baseball bat that killed the victim and that Lagadia's
9 continued focus on that point cast a cloud over the adequacy of any psychological evaluation.
10 RT 32-33.

11  The BPH heard closing arguments from the local district attorney who opposed parole
12 and from Lagadia' counsel. Lagadia read a prepared final statement before the BPH recessed
13 to deliberate.

14  The BPH decided that Lagadia was "not yet suitable for parole and would pose an
15 unreasonable risk of danger to society or a threat to public safety if released from prison." RT
16 42. The first reason articulated in support of that determination was that the commitment offense
17 had been carried out and manner that was "certainly callous," in a "very dispassionate manner,"
18 and in a manner that "demonstrates a callous disregard for human suffering." RT 43. The BPH
19 considered a circumstance and factors proper under California law, even if (as the Los Angeles
20 County Superior Court indicated) the commissioner did not correctly quote the language of the
21 regulation. See Resp. Exh. D. A circumstance tending to indicate unsuitability for parole is that
22 "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15
23 Cal. Code Regs. § 2402(c)(1). As the state court observed, the evidence definitely supported a
24 finding that the crime demonstrated an "exceptionally callous disregard for human suffering,"
25 and was carried out in a dispassionate manner. Resp. Exh. D, p. 2, citing § 2402(c)(1)(D) and
26 § 2402(c)(1)(B). The evidence that supported the finding was that the victim was followed,
27 forced into crashing his car, and beaten to death with a baseball bat. resp. Exh. D, p. 2. Lagadia
28 argues in his traverse that this "murder was terrible, but not 'especially' so." Memorandum of

Points & Authorities In Support of Traverse, p. 22.  That is an unrealistic view of a killing for which the autopsy report stated that "the victim died of blunt force trauma with numerous abrasions, contusions and lacerations to the face, with fractures to the nose, mandible and maxilla, with numerous, mostly frontal skull fractures and maceration and contusion predominately involving the frontal area of the brain, fatal wounds."  Resp. Exh. C, Probation Officer's Report, pp.3-4 (summarizing autopsy findings).   The facts of this murder were far beyond the minimum elements of a second degree murder.   See Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th at  682-83.

In addition to the murder, the BPH identified other reasons to support the determination that Lagadia's release would present an unreasonable risk of danger to society.  Lagadia's two violent crimes before the murder and admitted gang affiliation provided support for reliance on his pre-incarceration violence and unstable social history. 15 Cal. Code Regs. § 2402(c)(2, 3).

The BPH also relied on his disciplinary history, which was limited but did exist.

The BPH relied on Lagadia's insufficient programming in self-help programs.  There was evidentiary support for this determination.  The record discloses that the BPH was concerned about Lagadia's understanding and insight into the crime because every discussion of the crime seemed to consist of him denying that he swung the baseball bat.  If all the inmate was able to see about the murder was that he was not the one who actually swung the bat, he may well have not fully grasped his role in the death of a human being because, even if his passenger swung the baseball bat, Lagadia had forced the victim to crash his car into a pole and stood by  while his passenger beat someone to death.[4]

Each of the factors the BPH relied on had evidentiary support in the record.  The several factors combined provided significantly more than some evidence to determine that 14 actual years into a 15-to-life sentence, Lagadia was not yet suitable for parole.

---

[4] The record has evidence to support the view that Lagadia swung the bat (as reported by the probation officer) or that Lagadia's companion swung the bat (as reported by Lagadia).  This may well become an important point as to Lagadia's suitability further into his sentence, but at 14 actual years into his 15-to-life sentence, the facts of the crime under either version provided sufficient support to determine that he was not suitable for parole.  See Irons, 505 F.3d at 853.

11

The Los Angeles County Superior Court upheld the BPH's decision in a reasoned order. Resp. Exh. D. Because that is the last reasoned decision, that is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 547 U.S. 1138 (2006). The state superior court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to In re Rosenkrantz, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v. Hill some evidence standard as the proper standard for judicial review of evidentiary sufficiency for parole denial cases. See Rosenkrantz, 29 Cal. 4th at 665-67. The state superior court found that there was some evidence to support the BPH's decision. That court's rejection of Lagadia's due process claim was not contrary to or an unreasonable application of Superintendent v. Hill's some evidence standard.

**CONCLUSION**

For the foregoing reasons, the petition is denied. The clerk shall close the file.

IT IS SO ORDERED.

DATED: 5/1/08

                                    SUSAN ILLSTON
                                United States District Judge